UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. SACR 15-00063-JLS |
| Plaintiff, | **ORDER RE PRETRIAL MOTIONS** |
| v. | |
| TODD CHRISTIAN HARTMAN, | |
| Defendant. | |

Defendant is charged with two counts of transportation of child pornography in violation of 18 U.S.C. § 2252A(a)(1) and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Trial is currently set for December 1, 2015, and currently before the Court are a number of pretrial motions, which have been fully briefed and argued.[1] Specifically, presently before the Court are (1) the Government's Motion in Limine [No. 1] to Admit Child Pornography Images and Videos (Docs. 18, 25, & 38); (2) Defendant's Motion to Suppress Evidence[2] (Docs. 26, 35, 49, 69 & 76); (3) Defendant's Motion to Compel Discovery

---

[1] The motions were heard on October 16, 2015, and October 27-28, 2015. (*See* Docs. 55 & 61-62.) Evidence was admitted as to Defendant's Motion to Compel Discovery and to Suppress Evidence. The Court authorized the filing of post-hearing briefs as to the Motion to Compel Discovery and Motion to Suppress. In connection with its ruling on the present Motions, the Court has reviewed and considered the parties' filings, their argument, and the admitted evidence.

[2] For the first time after the hearing, Defendant suggests that a challenge to the validity of the warrant may be forthcoming. (Def.'s Post-Hr'g Brief at 3 n.3.) That issue is not currently before the

PETITIONER'S
EXHIBIT

F

ALL-STATE LEGAL®

1  (Docs. 27, 37, 47, 50 & 68-69); (4) Defendant's Motion in Limine [No. 1] to Exclude
2  "Other Acts" Evidence (Docs. 28, 40 & 48); and (5) Defendant's Motion to Exclude
3  Expert Testimony (Docs. 51-52).

4      A discussion of the Court's rulings as to all pretrial Motions is set forth below.

## I.  GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT CHILD PORNOGRAPHY VIDEOS AND IMAGES

7      The Government filed a Motion *in Limine* to Admit Child Pornography Images
8  and Videos. (Doc. 18.) Defendant Todd Christian Hartman filed a timely Opposition
9  brief, and the Government filed a Reply brief. (Docs. 25 & 38.) As set forth below, the
10  Court GRANTS IN PART the Government's Motion.

### A.  Evidence at Issue

12      The Government moves to admit approximately ten videos and twenty still
13  images[3] that it contends meet the definition of child pornography.[4]  Defendant argues
14  that the probative value of such evidence is substantially outweighed by its unfair
15  prejudicial effect, and therefore the images should be excluded pursuant to Federal
16  Rule of Evidence 403.

### B.  Elements of the Offense

18      The First Superseding Indictment ("FSI") charges Defendant with two counts of
19  transportation of child pornography (Counts 1 and 2) and one count of possession of
20  child pornography (Count 3). (Doc. 31.) To convict defendant of transportation of
21  child pornography, the Government must prove the following five elements beyond a
22  reasonable doubt:

Court, the Court has not considered it, and this Order does not address the validity of the search warrant.

[3] Hereinafter, when discussing the Government's present Motion in Limine, the Court's references to "the images" should be understood to refer to both videos and still images collectively.

[4] Six videos are identified in the Government's Motion. (Mot. at 6-8.) Three others are identified in the Reply. (Reply at 5.) Language in the Reply brief makes it unclear whether the Government still intends to offer the twenty still images. (*See id.*)

  The parties use the terms "child pornography" and "pornograph[y] . . . of minors," which is defined in 18 U.S.C. § 2256(8)(A), as meaning "any visual depiction, . . . of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct . . . ." *Id.*

2

1    First, that the defendant knowingly [transported] . . . a
2    visual depiction in interstate commerce by any means,
3    including a computer;
4    Second, that the production of such visual depiction
5    involved the use of a minor engaging in sexually explicit
6    conduct;
7    Third, that such visual depiction was of a minor
8    engaged in sexually explicit conduct;
9    Fourth, that the defendant knew that such visual
10   depiction was of sexually explicit conduct; and
11   Fifth, the defendant knew that at least one of the
12   persons engaged in sexually explicit conduct in such visual
13   depiction was a minor.
14   9th Cir. Crim. Jury Instr. 8.184 (2010). The charge of possession of child pornography
15   requires proof beyond a reasonable doubt of four similar elements:
16   First, that the defendant knowingly possessed [books]
17   [magazines] [periodicals] [films] [video tapes] [matters] that
18   the defendant knew contained [a] visual depiction[s] of [a]
19   minor[s] engaged in sexually explicit conduct;
20   Second, the defendant knew [each] [the] visual
21   depiction contained in the [[books] [magazines]
22   [periodicals] [films] [video tapes] [matters]] [[was of]
23   [showed]] [a] minor[s] engaged in sexually explicit conduct;
24   Third, the defendant knew that production of such [a]
25   visual depiction[s] involved use of a minor in sexually
26   explicit conduct; and
27   Fourth, that [each] [the] visual depiction had been
28   either

3

1             a)      [mailed] [shipped] [transported] in interstate or

2            foreign commerce, or

3              b)      produced using material that had been [mailed]

4            [shipped] [transported] in interstate or foreign commerce [by

5            computer [or other means]].

6 *Id.* at 8.185. "Sexually explicit conduct" is defined by statute as including "actual or

7 simulated . . . sexual intercourse, including genital-genital, oral-genital, anal-genital,

8 or oral-anal, whether between persons of the same or opposite sex; . . . masturbation[,]

9 . . . or [the] lascivious exhibition of the genitals or pubic area of any person . . . ." 18

10 U.S.C. § 2256(2)(A)(i), (iii) & (v).

11      **C.**     **The Parties' Positions**

12      The Government argues that the images are relevant to prove that Defendant

13 transported and possessed images that are in fact child pornography within the

14 statutory definition rather than merely innocent pictures of unclothed children. (Mot.

15 at 4.) Additionally, the Government contends that the images are relevant to prove

16 Defendant's knowledge. (*Id.*) In response, Defendant argues that his willingness to

17 stipulate that the files at issue are "pornographic [depictions] of minors [that] depict

18 actual or 'real' children" obviates the Government's need to introduce the images

19 themselves. (Opp'n at 2.) The Government counters that Defendant is unwilling to

20 stipulate to his knowledge that the images are sexually explicit depictions of minors

21 and that the persons depicted are minors. (Reply at 6.) Thus, in the Government's

22 view, because Defendant is not willing to stipulate to all the elements that the images

23 are offered to prove, those images should be admitted. (*Id.*) Moreover, the

24 Government argues that it is entitled to present evidence of its choosing rather than

25 accepting a Defendant's stipulation. (*Id.* at 3-5.)

26      **D.**     **Discussion**

27      Both parties recognize that the evidence is to be excluded, if at all, pursuant to

28 Federal Rule of Evidence 403:

> The court may exclude relevant evidence if its
> probative value is substantially outweighed by a danger of
> one or more of the following: unfair prejudice, confusing the
> issues, misleading the jury, undue delay, wasting time, or
> needlessly presenting cumulative evidence.

*Id.* Evidence is relevant if it has any tendency to make a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401. Here, the relevance of the images to the elements of the charges is both obvious and undeniable.

The images are highly probative of four of the five elements of the transportation charges. Specifically, an examination of the content of the images will likely influence the jury's determination of whether the second and third elements are met because it is highly likely to reveal whether there are depictions of any minors engaged in sexually explicit conduct and whether actual minors engaging in sexually explicit conduct were used in the production of the images. Moreover, examination of the content of the images is highly likely to influence the jury's determination of whether a person viewing the content would, by simply viewing that content, understand that the images constitute visual depictions of minors engaged in sexually explicit conduct. Thus, the images are also highly probative of the fourth and fifth elements of the transportation charges.

In the same manner, the images are highly likely to influence the jury's determination of three of the four elements of the possession charge. Like the transportation charge, the images themselves are highly probative as to all elements of the offense other than the transportation in commerce element.

Therefore, it is clear that the images are highly probative. However, the images are also inherently inflammatory. Therefore, the Court must balance the probative value against the danger of unfair prejudice before ruling on admissibility.

Defendant urges the Court to consider the availability of alternative evidence

1    and exclude the images themselves. Although Defendant has offered to stipulate that

2    the images fall into the definition of child pornography, this does not render those

3    images wholly excludable under Rule 403. As argued by the Government,

4    Defendant's stipulation does not address his knowledge of the content of the images in

5    the manner required to prove several of the elements of the charged offenses.

6        Defendant contends that in the Court's 403 analysis, the Court must factor in

7    his willingness to reach a stipulation with the Government regarding the content of the

8    files, relying on the Ninth Circuit case of *United States v. Merino-Balderrama*, 146

9    F.3d 758, 762 (9th Cir. 1998). (Opp'n at 2.) This case is distinguishable. In *Merino-*

10   *Balderrama*, the court held that the jury should not have been shown films of child

11   pornography where Defendant stipulated that the films contained child pornography

12   and that those films had traveled in interstate commerce. 146 F.3d at 761-63. As is the

13   case here, the defendant refused to stipulate to his knowledge of the content of the

14   films, and the films were shown to establish that knowledge. *Id.* The Ninth Circuit

15   found an abuse of discretion to show the films because the content of the films was

16   not probative of the defendant's knowledge because there was no evidence he had

17   viewed the films. *Id.* Rather, the boxes in which the film reels had been packaged,

18   which the defendant had seen, clearly depicted images of children (cut from the film)

19   engaged in sexual conduct. *Id.* In such an instance, the films themselves lacked any

20   additional probative value. *Id.*

21       Here, there is nothing analogous to the film reel boxes that is probative as to

22   Defendant's knowledge. This case involves intangible computer files rather than

23   tangible media, and therefore admission of images in this case can easily be limited to

24   images found in files where there is forensic evidence that Defendant actually

25   accessed. *Cf. United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008) ("[F]or

26   every image shown to the jury there was forensic evidence that the files had actually

27   been opened and viewed after downloading.").

28       The Court is not alone in rejecting Defendant's offer to stipulate as a means of

1    avoiding admission of child pornography images at trial. To the contrary, courts have

2    consistently admitted images of child pornography notwithstanding a defendant's

3    willingness to stipulate that the images at issue depict actual minors engaged in

4    sexually explicit conduct. *See, e.g., Ganoe*, 538 F.3d at 1123 (rejecting the argument

5    that the "probative value of the images was eliminated by his offer to stipulate that the

6    images represented actual children engaged in sexual conduct and that anyone seeing

7    the images even for a moment would know that they were child pornography");

8    *United States v. Cunningham*, 694 F.3d 372, 391 (3d Cir. 2012) (noting a "near-

9    uniform agreement that the admission of child pornography images or videos is

10   appropriate, even where the defendant has stipulated, or offered to stipulate, that those

11   images or videos contained child pornography" and collecting cases); *United States v.*

12   *Storm*, 915 F. Supp. 2d 1196, 1201 (D. Or. 2012) (collecting cases) *aff'd*, 612 F.

13   App'x 445 (9th Cir. 2015). Thus, Defendant's offer to stipulate to certain elements of

14   the charged offenses does not alter the admissibility of the images offered by the

15   Government.

16        Nevertheless, on the issue of unfair prejudice, the Court finds that it cannot

17   render a final decision in advance of trial regarding admissibility of all images sought

18   to be introduced at trial. As noted by Defendant, at some point, the law of diminishing

19   returns reduces the probative value of each additional image, and the danger of unfair

20   prejudice increases with each additional image to the point where that danger

21   substantially outweighs any incremental probative value of each additional image.

22   Relatedly, at some point, the presentation of additional images to the jury will amount

23   to the needless presentation of cumulative evidence, which also requires exclusion

24   pursuant to Rule 403.

25        However, that is not to say that the Court cannot make any pretrial rulings on

26   the issue of admissibility of the images. First, as a general rule, to the extent the

27   images are offered to show Defendant's knowledge, where the Government offers

28   evidence that Defendant actually opened and viewed the computer files at issue, the

1    Government may show the image to the jury. *Ganoe*, 538 F.3d at 1124. However, as

2    noted previously, at some point, even evidence of this type may cease to have

3    sufficient probative value, or may represent needlessly cumulative evidence, and the

4    Court will exclude it.

5         Second, as to the specific images offered, the Court declines Defendant's

6    invitation to limit the prosecution to showing the (presumably less inflammatory)

7    images that depict minors engaged in "sexually explicit conduct" that falls within the

8    § 2256(2)(A)(v) definition while excluding the (presumably more inflammatory)

9    images that fall within the definitions of § 2256(2)(A)(i) and (iii). The latter requires

10   depictions of acts of sexual intercourse (broadly defined), while the former requires

11   only "lascivious exhibition of the genitals or pubic area." 18 U.S.C. § 2256(2)(A)(i) &

12   (v). Defendant's point is that "videos showing oral sex or sexual intercourse are not

13   necessary." (Opp'n at 3.) However, a determination of whether the "exhibition of the

14   genitals or pubic area" is "lascivious" requires attention to subtle considerations that

15   are not implicated when the image at issue depicts actual or simulated sexual

16   intercourse (broadly defined). *See, e.g., United States v. Banks*, 556 F.3d 967, 979-80

17   (9th Cir. 2009) (noting that "applied to the conduct of children, lasciviousness is not a

18   characteristic of the child photographed but of the exhibition which the photographer

19   sets up for an audience that consists of himself or likeminded pedophiles.") (citation

20   omitted).

21        Third, and notably, the six videos intended to be offered by the Government are

22   described in its motion to total more than eighteen minutes in length. (Mot. at 6-8.)

23   Three more videos are described in the Reply, but the length of those videos are not

24   disclosed. (Reply at 5.) Taken together, these videos are far too lengthy, and are

25   highly prejudicial. Indeed, the length of any one of these videos exceeds the length

26   required to prove the elements of the charged offense to which it relates. The purpose

27   for which the videos are offered can be served by excerpts from those videos, or even

28   still images from those videos, and in unedited form, the Court is highly unlikely to

1    admit all these videos or to admit the entirety of any video. *Cf. Ganoe*, 538 F.3d at

2    1124-25 ("The district court limited the government to ten clips, each one lasting a

3    few seconds, with a total duration of under one minute.").

4        **E.**    **Ruling**

5           Subject to the discussion set forth above and articulated by the Court at the

6    October 16, 2015 Status Conference, the Court GRANTS IN PART the Government's

7    Motion in Limine to Admit [No. 1] to Admit Child Pornography Images and Videos.

8           Thus, as articulated by the Court at the October 16, 2015 Status Conference, the

9    parties are directed to meet and confer regarding the images and videos to be offered

10   at trial. As represented by the Government at the Status Conference, its then-current

11   editing had reduced the length of 9 videos it intends to ask the Court to publish from

12   more than 18 minutes to approximately 4 minutes. (*See* 10/16/2015 Tr. at 5-6.) The

13   Court directed the parties to meet and confer with the goal of reducing the total length

14   of the video excerpts to no more than one minute, and the Court directed the

15   Government to consider whether still images from those videos would suffice in

16   presenting its case. (*Id.* at 8-9.)

17          In this manner, the Court GRANTS IN PART the Government's Motion *in*

18   *Limine* to Admit Child Pornography Images and Videos. (Doc. 18.)

19   **II.**    **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

20          The defense moves to suppress Defendant's videotaped statements made to an

21   investigator during the execution of a search warrant at Defendant's residence.

22   (Doc. 26.) The Government filed an Opposition brief (Doc. 35), Defendant filed a

23   Reply brief (Doc. 49), and the Court held a suppression hearing. The parties filed

24   post-hearing briefs. (Docs. 69 & 76.)

25          During the early-morning execution of a search warrant at his residence on

26   February 5, 2015, Defendant was interviewed regarding his possession of child

27   pornography by Huntington Beach Police Department Detective David Syvock, but he

28   was not given *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

1    As a result, Defendant contends that he was subjected to a custodial interrogation

2    without *Miranda* warnings, and that his statements must therefore be suppressed. The

3    Government maintains that the interview of Defendant was not custodial.

4         **A.    Factual Findings and Credibility Determinations**

5         In ruling on a Motion to Suppress, the district court must resolve factual

6    disputes and must state its findings. Fed. R. Crim. P. 12(d) ("When factual issues are

7    involved in deciding a motion, the court must state its essential findings on the

8    record."). In doing so, the district court may make credibility determinations. *See,*

9    *e.g., United States v. Arreguin*, 735 F.3d 1168, 1174 (9th Cir. 2013); United States v.

10   *Labrada-Bustamante*, 428 F.3d 1252, 1259 (9th Cir. 2005).

11        In the subsections that follow, the Court discusses its factual findings and sets

12   forth citations to the record that support those findings. The Court pauses here to

13   discuss witness credibility. For instance, the Court credits the testimony of Defendant

14   that he was told by two officers that he could not leave his residence while the search

15   warrant was being executed. Although Detective Syvock and Agent Speakman

16   testified that they did not inform Defendant that he could not leave, approximately

17   twelve other officers who did not testify at the hearing were at Defendant's residence,

18   and any one of them could have told Defendant he was not free to leave.

19        On a number of points, the Court discredits the testimony of Detective Syvock.

20   The Court does so in light of inconsistencies between Detective Syvock's account of

21   the events that occurred during the execution of the search warrant at Defendant's

22   residence and other evidence, including videotaped evidence and the testimony of

23   other law enforcement officers. First, as discussed above in connection with

24   Defendant's testimony, the Court discredits Detective Syvock's statement in his

25   Declaration that Hartman was not "in any way restrained from leaving." (Syvock

26   Decl. ¶ 12.)[5] Moreover, despite Detective Syvock's testimony to the contrary, the

---

[5] The Syvock Declaration is attached as an Exhibit to the Government's Opposition brief. (Doc. 35-1.)

1   Court credits Defendant's testimony that Detective Syvock placed his hands behind

2   his back and held them there. (*Compare* 10/28/15 Tr. at 160 ("I did not put his hands

3   behind his back.") *with id.* at 238 (Hartman's testimony to the contrary).)[6] The Court

4   credits Defendant's testimony because it is corroborated by the testimony of his

5   neighbor, a disinterested third-party witness. (*See* 10/27/15 Vol. II at 21-22 & 25

6   (neighbor's testimony that Defendant was handcuffed or had his hands held behind his

7   back).)[7] The Court also discredits Detective Syvock's testimony as to whether

8   Defendant was physically restrained because Detective Syvock was unquestionably

9   incorrect about another issue related to the amount of control he exerted over

10  Defendant during his interrogation. Specifically, Detective Syvock's Declaration

11  differed from the irrefutable videotaped evidence on a central issue: whether

12  Detective Syvock was visibly armed with a handgun when he interrogated Hartman.

13  (*Compare* Syvock Decl. ¶ 14 (stating that Syvock concealed his gun during his

14  interrogation of Defendant) *with* Motion Ex. C (still images from video of

15  interrogation with both officers carrying unconcealed handguns on waist) *and*

16  10/28/15 Tr. at 138-39 (testimony regarding the inconsistency).)

17        An additional inconsistency is found between Detective Syvock's testimony

18  and that of Defendant, disinterested third-party witnesses, and two other law

19  enforcement officers, all of whom testified that Defendant was not wearing a shirt

20  when he was ordered out of his residence upon the officers' initial entry. (*Compare*

21  Syvock Decl. ¶ 7 (Defendant was outside "wearing shorts and a t-shirt") *with* 10/28/15

22  Tr. at 233 (Hartman testified he was wearing "boxer briefs") *and* 10/27/15 Tr. Vol. II

23  at 95-96 (neighbor testimony that Defendant wore only his boxers and no shirt) *and*

24  10/27/15 Tr. Vol. II at 106 (second neighbor's testimony that Defendant wore no

25  shirt) *and* 10/28/15 Tr. at 122 (Officer Bard's testimony that Defendant wore "shorts

---

[6] The October 28, 2015 Transcript is attached as an Exhibit to the Defendant's Post-Hearing brief in support of the Motion to Suppress. (Doc. 76-2.)
[7] The October 27, 2015 Vol. II Transcript is attached as an Exhibit to the Defendant's Post-Hearing brief in support of the Motion to Suppress. (Doc. 76-1.)

1    or boxers, or pajama[] bottoms" without a shirt) *and* 10/28/15 Tr. at (Agent

2    Speakman's testimony that Defendant wore "boxer shorts . . . or shorts and . . . no

3    shirt.")

4         Whether Defendant was told by an officer he couldn't leave, whether he was

5    restrained physically by the interrogating officer at any point, and whether the

6    interrogating officer was wearing an unconcealed handgun during the interrogation are

7    all crucial facts in the Court's determination of whether Defendant's statements

8    should be suppressed.  Detective Syvock's testimony on these points is unreliable.

9    The last point, whether Defendant was wearing a shirt or not, is less crucial, but it is

10   still relevant, and the fact that Detective Syvock's Declaration is inconsistent with

11   testimony of five other witnesses, including two law enforcement officers, tends to

12   underscore the unreliability of his testimony on the more important points.

13        With those initial observations regarding credibility, the Court considers

14   whether Defendant's statements should be suppressed.

15   **B.    *Miranda* Standard of Admissibility**

16        The Government may not offer as evidence those statements that are obtained

17   as a result of a custodial interrogation of the accused unless the Government can show

18   that the accused was advised of his right to remain silent, that anything he says can be

19   used against him in a court of law, that he has the right to counsel, and that if he

20   cannot afford counsel one will be appointed for him prior to questioning. *Miranda*,

21   384 U.S. at 478-79.

22        Where a suspect is not formally in police custody, a court may determine that

23   he is nevertheless "in custody" for purposes of *Miranda* where the suspect is

24   "deprived of his freedom of action in any significant way." *Id.* at 444. In doing so, the

25   Court asks whether, in the totality of the circumstances, a reasonable person would

26   "have felt he or she was not at liberty to terminate the interrogation and leave."

27   *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

28        The Ninth Circuit has recognized that unique "analytical challenges" are

1    presented where, as here, the interrogation at issue is conducted in the suspect's

2    residence. *United States v. Craighead*, 539 F.3d 1073, 1082-89 (9th Cir. 2008) ("[A]

3    reasonable person interrogated inside his own home may have a different

4    understanding of whether he is truly free 'to terminate the interrogation' if his home is

5    crawling with law enforcement agents conducting a warrant-approved search."). In

6    considering the issue, the court in *Craighead* identified a non-exhaustive list of factors

7    courts should consider in determining whether an at-home interrogation of an accused

8    is custodial in nature. 539 F.3d at 1084. Those factors are:

9        (1) the number of law enforcement personnel and whether

10        they were armed; (2) whether the suspect was at any point

11        restrained, either by physical force or by threats; (3) whether

12        the suspect was isolated from others; and (4) whether the

13        suspect was informed that he was free to leave or terminate

14        the interview . . . .

15    *Id.* at 1084. Also relevant is "the context in which any . . . statements were made." *Id.*

16    The Court considers these factors.

17       **C.**    **Application of *Craighead* Factors**

18        First, the Court considers the number of law enforcement personnel and

19    whether they were armed. In *Craighead*, the court noted that the presence of a large

20    number of officers that filled the home would contribute to a finding that an

21    interrogation was custodial in nature. *Id.* Moreover, a large number of officers

22    contribute to a suspect's reasonable belief that he would be stopped if he attempted to

23    leave. *Id.* at 1084-85. Additionally, the presence of unholstered weapons may signify

24    threat of police force, and the presence of more than one law enforcement agency may

25    obscure the chain of authority such that a suspect may reasonably believe that officers

26    of one agency have no authority to speak for officers of another agency. *Id.* at 1085.

27        Here, a total of fourteen officers were assigned to execute the search warrant at

28    Defendant's residence. (10/28/15 Tr. at 136 & 153.) An entry team of eight law

1    enforcement officers entered the small apartment where Defendant lived with his

2    mother. (10/28/15 Tr. at 194; Gomez Decl. ¶ 2 (estimating the square footage of the

3    apartment at 612 square feet).) Detective Syvock testified that the apartment was so

4    small that it was unlikely that all fourteen officers would have fit in the apartment at

5    the same time. (10/28/15 Tr. at 136-37.) The number of officers involved in executing

6    the search warrant at Defendant's residence has the tendency to create the type of

7    police-dominated environment that creates a reasonable belief that one is not free to

8    leave. Indeed, Defendant testified that two officers indicated to him that he was, in

9    fact, not free to leave at all. (Hartman Decl. ¶¶ 5-6; 10/28/15 Tr. at 204-05.)[8]

10          In addition to the number of officers, this factor considers whether the officers

11   were armed. Here, the officers who entered Defendant's residence were heavily

12   armed, and Defendant was repeatedly interrogated by two officers who were visibly

13   armed with handguns. Agent Speakman was the first to enter, and he pointed a

14   military-style rifle at Defendant's chest. (Hartman Decl. ¶¶ 2-3; Speakman Decl. ¶ 8.)[9]

15   Agent Speakman testified that that the rifle was chosen for its accuracy and its ability

16   to intimidate occupants encountered when executing a search warrant. (10/28/15 Tr. at

17   188-89 (agreeing with statement that this rifle is intended to make occupants "stop in

18   their tracks").) Moreover, even after the residence was secured by a protective sweep,

19   the officers who interrogated Defendant remained visibly armed. (*See* Mot. Ex. C.) It

20   is clear that the presence of armed officers could have reasonably contributed to a

21   belief by Defendant that he was not free to leave.

22          Finally, here, as in *Craighead*, it was unclear who was in charge of the

23   execution of the search warrant. Specifically, as in *Craighead*, the fourteen officers

24   were from three separate law enforcement agencies involved in executing the search

25   warrant: the Huntington Beach Police Department, the Orange County Sheriff's

26   Department, and the United States Department of Homeland Security. (10/28/15 Tr. at

---

[8] The Hartman Declaration is attached as an Exhibit to the Motion to Suppress. (Doc. 26-1.)
[9] The Speakman Declaration is attached as an Exhibit to the Government's Opposition. (Doc. 35-2.)

1   151.) Moreover, even Detective Syvock, who was in charge of the investigation, had

2   difficulty identifying who was in charge of operations during the execution of the

3   search warrant. (10/28/15 Tr. at 154-57.) Defendant testified he did not know who was

4   in charge at the scene, either. (10/28/15 Tr. at 207 ("No one informed me of who was

5   in charge . . . .").)

6        In sum, as to the first factor, it is clear that there were many law enforcement

7   officers in the very small space of Defendant's residence. They entered the residence

8   led by a law enforcement officer armed with an assault rifle, and Defendant's

9   interrogators remained armed. There was no clear discernible chain of command or

10  any identifiable officer in charge of the search warrant execution. Accordingly, this

11  first factor weighs heavily in favor of a finding of custodial interrogation.

12       Second, the Court considers whether the suspect was restrained at any time,

13  whether through physical force through the use of threats. *Craighead*, 539 F.3d at

14  1085. This includes consideration of the ability of the suspect to move around the

15  residence freely, without police escort or monitoring. *Id.* In considering this factor, it

16  is irrelevant if the measures taken by law enforcement officers are necessary

17  precautions to safely execute the search warrant. *Id.* at 1086.

18       Here, Defendant was confronted by armed police officers entering his

19  residence. (10/28/15 Tr. at 212-13.) A military rifle was pointed directly at him.

20  (10/28/15 Tr. at 188-89.) Defendant was ordered at gunpoint to put his hands up, and

21  then after he complied, he was ordered to put his hands up higher. (10/28/15 Tr. at

22  214-15.) He was escorted out of his residence, dressed only in his underwear, where

23  he remained for approximately 10 to 15 minutes. (Hartman Decl. ¶ 3; 10/28/15 Tr. at

24  233.) He was ordered not to leave when he approached the stairs. (Hartman Decl. ¶ 5;

25  10/28/15 Tr. at 204-05.) He was again ordered not to leave during a break between

26  Detective Syvock's interrogation sessions. (Hartman Decl. ¶ 6; 10/28/15 Tr. at 204-

27  05.)  He was told before the first break between interrogation sessions that he would

28  not be permitted to move around the apartment during a break in the interrogation.

1    (Gov't Opp'n Ex. A (videotaped interview at time stamp 7:43 a.m.).) Thus, it is clear

2    that Defendant was initially restrained by the threat of the use of deadly force, that his

3    movement within his residence was highly restricted, and that he was prohibited from

4    leaving the residence. Accordingly, the second factor also weighs heavily in favor of a

5    finding of custodial interrogation.

6         Third, the Court must consider the "crucial factor" of whether the suspect was

7    isolated from others. *Craighead*, 539 F.3d at 1086-87. This factor is especially

8    important because police domination of a suspect's will is less likely to occur when

9    the suspect is in the company of individuals such as family, friends, or colleagues who

10   might give moral support to the suspect or actively discourage the suspect from

11   making inculpatory statements. *Id.* at 1087. Indeed, the Ninth Circuit has suggested

12   that affirmative actions by officers to isolate the suspect from friends and family in his

13   own home may be sufficient to find that an interrogation is custodial in nature. *Id.*

14   ("The FBI may exclude whomever it chooses from an interrogation; *Miranda* requires

15   that if the FBI isolates the suspect, and the suspect does not reasonably believe he is

16   free to leave, warnings must be given.")

17        Here, Defendant was isolated from his mother, and there is no suggestion in the

18   record that Defendant was at any time given the option of having his mother present

19   during his interrogation. (Hartman Decl. ¶ 6; *cf.* 10/28/15 Tr. at 209 (Defendant

20   testified he did not ask for his mother to be present because "[he] didn't know that

21   [he] could ask that").) Detective Syvock testified that he interrogated Defendant in his

22   mother's bedroom, with the door closed, in order to protect Defendant's privacy.

23   (10/28/15 Tr. at 171; *but cf.* Syvock Decl. ¶ 9 (mother's bedroom used because this

24   was the only room not yet being searched by officers).) While Detective Syvock may

25   have indeed been motivated by the desire to protect the privacy of the accused,

26   Detective Syvock's subjective intent is not relevant to the Court's inquiry as to this

27   factor. What is relevant to the Court's inquiry is whether Defendant was in fact

28   isolated before he was interrogated. On this point, there is no dispute.

1  Defendant's isolation contributes greatly to a reasonable belief that he was not

2  free to leave or refuse to answer Detective Syvock's questions. Unlike the

3  circumstances in *Craighead*, no officer was physically blocking the door that led out

4  of the bedroom where Defendant was interrogated; however, Defendant understood

5  that just beyond the closed door, there awaited armed law enforcement officers who

6  had twice denied his attempts to leave his residence. Detective Syvock himself set up

7  the room to interrogate Defendant in isolation. Whether he intended to protect

8  Defendant's privacy or had some other subjective motive, what he actually did was

9  isolate Defendant from the sole family member present at the residence and instead

10  placed Defendant in the presence of two armed police officers who interrogated him

11  without first advising him of his right to remain silent and his right to counsel.

12  Therefore, this "crucial" third *Craighead* factor likewise weighs in favor of a finding

13  that Defendant was in custody when he was interrogated.

14  Fourth, the Court considers whether the suspect was told that he was free to

15  leave and that he could end the interview. *Craighead*, 539 F.3d at 1087-88. Here, it is

16  clear that Defendant was told on more than one occasion that he was free to leave.

17  Therefore, this factor weighs in favor of finding that Defendant was not in custody

18  when he was interrogated by Detective Syvock.

19  However, the mere fact that a suspect is told that he is free to leave is not

20  dispositive. "The *Miranda* test for custody does not ask whether the suspect was told

21  that he was free to leave; the test asks whether a reasonable person [would] have felt

22  he or she was not at liberty to terminate the interrogation and leave." *Id.* at 1088

23  (internal alteration marks, quotation marks, and citation omitted). Indeed, in

24  *Craighead*, the court found that the suspect was subjected to a custodial interrogation

25  even though he was told that he was free to leave. *Id.*

26  Here, the Court makes a similar conclusion, and on similar facts. The Court's

27  reasoning applies both to the fourth *Craighead* factor and the more general *Craighead*

28  consideration of "the context in which any . . . statements were made." 539 F.3d at

1084. Viewed in the totality of the circumstances, although Detective Syvock informed Defendant more than once that Defendant was free to leave, all other circumstances clearly communicated a contrary message.

Specifically, in the early morning hours of February 5, 2015, fourteen armed law enforcement officers descended upon Defendant's small residence to execute the search warrant. Defendant's compliance with the officers' commands was demanded at gunpoint. Defendant was led outside of his residence in his underwear. Defendant was prevented from leaving on two separate occasions. Defendant was not given a choice before he was isolated from the only family member who was present at the residence. In isolation, Defendant was interrogated by two visibly armed law enforcement officers. There was no ascertainable officer in charge or evident chain of command at the scene; instead, three agencies reasonably appeared to share authority for the police presence at Defendant's residence. Under these circumstances, a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112.

**D.   Ruling**

The first three *Craighead* factors weigh heavily in favor of a finding that Defendant was subjected to custodial interrogation without being given *Miranda* warnings. The fourth factor weighs against such a finding, but as the Ninth Circuit found in *Craighead*, this Court finds that verbal reassurances that Defendant was free to leave were ineffective in light of the circumstances. Therefore, under the totality of the circumstances, the Court concludes that Defendant was subjected to a custodial interrogation during the execution of the search warrant at his residence on February 5, 2015. It is undisputed that Defendant was not given *Miranda* warnings; therefore, the Court rules that the government may not offer as evidence any statements that were obtained as a result of that interrogation.

The Court GRANTS Defendant's Motion to Suppress as to the statements he made during the interrogation by Detective Syvock during the execution of the search

1  warrant on February 5, 2015.

2  Conversely, the Court denies the Motion to Suppress to the extent it seeks

3  exclusion of evidence other than Defendant's statements. Specifically, Defendant

4  moves to suppress "statements made by witnesses who were contacted after they were

5  identified by [Defendant] during his interrogation." (Mot. at 15.)  Because the

6  *Miranda* rule is a prophylactic that sweeps beyond the actual right against compelled

7  self-incrimination, the "fruit of the poisonous tree" doctrine does not apply in every

8  instance in which *Miranda* is violated. *United States v. Patane*, 542 U.S. 630, 639

9  (2004). Thus, the fruits of statements obtained in violation of *Miranda* need not be

10  suppressed unless those statements are also found to be involuntary under the Due

11  Process Clause. *See, e.g., United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir.

12  2014) (en banc) (discussing voluntariness). Defendant does not argue that his

13  statements were involuntarily obtained in violation of his due process rights, and the

14  record here does not support such a finding. Therefore, the Court DENIES the Motion

15  to Suppress to the extent it seeks suppression of any evidence other than Defendant's

16  statements.

17  **III.  DEFENDANT'S MOTION TO COMPEL DISCOVERY**

18  Defendant filed a Motion to Compel Discovery. (Doc. 27.) The Government

19  filed an Opposition brief (Doc. 37), and Defendant filed a Reply brief and Supplement

20  thereto (Docs. 47 & 50). The Court held a hearing, and the parties filed Post-Hearing

21  briefs. (Docs. 68-69.)

22  **A.  Defendant's Request for Discovery**

23  Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring production of

24  exculpatory evidence), *Giglio v. United States*, 405 U.S. 150 (1972) (requiring

25  production of impeachment evidence), and Federal Rule of Criminal Procedure 16,

26  Defendant seeks discovery regarding specialized software,[10] including installable

27
28  [10] The defense represents that prior to the filing of the Government's Opposition brief, only one type of software, known as Peer Spectre, had been identified as being used in the investigation. (Reply at 2 & n.1.) The other software identified by the Government in the Opposition brief is known as

19

1  copies of the software, used by investigators to locate and download the computer

2  files that led to the two transportation of child pornography counts in the FSI.

3  Defendant seeks discovery of the software in order to effectively cross examine the

4  law enforcement officer who used the software in the investigation that led to the

5  present charges. The Government opposes Defendant's request as seeking information

6  protected by the qualified law enforcement privilege and as overly broad.

7  **B.    Standard for Disclosure**

8       The Government objects to the discovery request based upon the qualified law

9  enforcement privilege. There is a qualified government privilege to protect from

10  disclosure sensitive investigative techniques where such exclusion does not unduly

11  prejudice the defense. *United States v. Van Horn*, 789 F.2d 1492, 1507 (11th Cir.

12  1986). To obtain disclosure, a defendant must show a need for the information and

13  must show more than a "mere suspicion" that the withheld information will prove

14  "relevant and helpful" to his defense or that disclosure is essential to a fair trial.

15  *United States v. Henderson*, 241 F.3d 638, 645 (9th Cir. 2001). If the defendant does

16  so, courts must balance the public's interest in protecting the flow of information with

17  the defendant's right to prepare his or her defense. *United States v. Whitney*, 633 F.2d

18  902, 911 (9th Cir.1980); *Roviaro v. United States*, 353 U.S. 53, 62 (1957) ("Whether a

19  proper balance renders nondisclosure erroneous must depend on the particular

20  circumstances of each case, taking into consideration the crime charged, the possible

21  defenses, the possible significance of the [undisclosed evidence], and other relevant

22  factors.")

23       The Court therefore considers whether Defendant has made the threshold

24  showing that the withheld information will be relevant and helpful to his defense, or

25  that disclosure is essential to a fair trial.

26

27  Shareaza LE. (*Id.*) The Government represents that Peer Spectre was used to identify Defendant's IP address, but that Shareaza LE was used to download the files from Defendant's computer. (Opp'n at 1 n.1.) The defense seeks production of both Peer Spectre and Shareaza LE. For the sake of simplicity, the Court refers collectively to both types of software as "the software."

28

### C.     Relevance and Helpfulness of Discovery Request

Defendant's consistently and specifically articulated concern regarding the operation of the specialized software is its ability (or lack thereof) to limit its searching to those files that are designated as "publicly available" or shareable files. (*See, e.g.*, Mot. at 5 (seeking discovery regarding the software to cross-examine a witness who stated that the software "reads the publicly available advertisement from computers that are identifying child sexual abuse images available for distribution"); Reply at 5 (identifying "the issue of whether government software has the ability to access files that are not in shared folders or have been deleted"); Def.'s Post-Hr'g Brief at 1-2 & Ex. B (requesting a demonstration of how the software is coded to navigate files on suspect's computer to determine whether the software accesses non-shared files).)

Here, as explained more fully below, the head of the investigation used the software to identify and download the two files that form the bases of the two transportation charges. Under the facts of this case, the Government's ability to prove the first element of the transportation charges, that Defendant "knowingly transported" child pornography by use of his computer, is dependent upon whether the downloaded files were "publicly available." Therefore, how reliably the software distinguishes between "publicly available" and non-shared files is squarely at issue.

In the Government's investigation leading to the present prosecution, as set forth in the Search Warrant Affidavit ("SW Affidavit"), Detective Syvock used the specialized software to identify an Internet Protocol address ("IP address"), 76.172.3.11, that had been identified as being associated with child pornography. (SW Affidavit at 12-13.) [11] Detective Syvock thereafter used the specialized software to connect to Defendant's computer and download videos of child pornography by use of a P2P file-sharing network. (*Id.* at 13.) Two downloaded files form the factual basis

---

[11] The Search Warrant Affidavit is attached to the Government's Supplemental Briefing Opposing Defendant's Motion to Compel Discovery ("Supp'l Opp'n") as Exhibit A. (Doc. 59-1.)

1   underlying the two counts of transportation of child pornography charged in the FSI.

2   (*See id.* at 14 & 16; *cf.* FSI at 2-3.) Other downloaded files were used to support the

3   application for the search warrant. (SW Affidavit at 12-16.) Thus, there is some

4   support for the contention that Defendant maintained computers files containing child

5   pornography as "publicly available" via a P2P file-sharing network, and that six such

6   files were "publicly available" when downloaded by law enforcement officials.

7          However, the statements made in the Search Warrant Affidavit in many

8   instances lack precision, and the Government has not refuted the defense expert's

9   analysis that suggests the files at issue here were not designated as shareable. First,

10  although Detective Syvock's Search Warrant Affidavit states that Defendant's

11  computer contained files with child pornography in a "shared folder," Detective

12  Syvock does not specifically identify the file path from which the files at issue here

13  were downloaded. In other words, he does not state that he downloaded the files at

14  issue from Defendant's "shared folder"; instead, Detective Syvock merely states that

15  he "made a direct connection to the [Defendant's] computer . . . and download[ed] 5

16  files this computer was making available."[12] (*Id.*) One interpretation of the phrase

17  "files this computer was making available" could be that it means that the files were

18  found in Defendant's "shared folder," but this is not the only possible interpretation.

19  Thus, although the "making available" phrase is not inconsistent with the files being

20  found in the "shared folder," the phrase is unclear, and the Search Warrant Affidavit

21  does not specify the location of the downloaded files.

22          Second, the defense expert testified that the downloaded files were not found in

23  the Defendant's "shared folder." Specifically, Defendant's expert, Tami L. Loehrs, a

24  computer forensics expert, performed a forensic examination of information

25  downloaded from Defendant's computer. (Loehrs Decl. ¶ 13.)[13] She states that four of

26  the six files downloaded from the HP Pavilion by Detective Syvock as part of the

27  ─────────────

28  [12] The detective makes a similar statement elsewhere in the SW Affidavit. (*Id.* at 16 (referring to a file that the Defendant's "computer was making available to share").)
[13] The Loehrs Declaration is attached to Defendant's Supplement to the Reply brief. (Doc. 50-1.)

1    investigation were not among the 600 files (of 4,000 total files) designated as

2    "publicly available" files. (*Id.* ¶¶ 13-14.) Although the two remaining files were

3    designated as "publicly available," they had not been shared since May 2014, which is

4    nearly three months before the inception of Detective Syvock's investigation. (*Id.*

5    ¶ 14.)

6            Despite ample opportunity to do so, the Government has not refuted this

7    testimony; instead, the Government's many criticisms of Ms. Loehrs' opinion are

8    unrelated to the issue at hand. Although the Government takes issue with Ms. Loehrs'

9    implication that the specialized software could be used to override an individual's file-

10   sharing settings, it does not represent that such an occurrence is impossible or

11   infeasible. (*See* Gov't Post-Hr'g brief at 9-10.) Additionally, to the extent that the

12   Government focuses on the lack of technical support for Ms. Loehrs' contention, the

13   software simply has not been made available for testing. (*See id.*) Further, even if the

14   defense cannot point to any other case in which a court expressed the "serious

15   concerns" with the software reported by Ms. Loehrs − an argument the Government

16   made repeatedly at the hearing − what another court has held (or failed to hold) is not

17   dispositive of the issue before this Court in this case. (*See id.*) Finally, although the

18   Government criticizes Ms. Loehrs' "lack of precision" in failing to distinguish

19   between the aMule software and the eMule software, the Government does not link

20   this failure to the soundness of Ms. Loehrs' opinion regarding the non-shared nature

21   of the files at issue here.[14]  (*See id.*; *cf.* Loehrs Decl. ¶ 14.)

22          Thus, the Court concludes that Ms. Loehrs' expert opinion makes a sufficient

23   showing regarding the relevance and helpfulness of the discovery sought by the

24   defense. The Court must therefore balance the public's interest in protecting the flow

25   of information against the defendant's right to prepare his or her defense. *Whitney*,

26   633 F.2d 902, 911; *Roviaro*, 353 U.S. at 62. Certainly, the public has a strong interest

---

[14] If the Government's point is that examination of aMule folders reveal that the files were
downloaded from a location on Defendant's computer containing shared files, then it should simply
have stated and supported this argument.

1  in keeping confidential any technical information that could enable those who would

2  trade in child pornography to improve their ability to evade detection and prosecution.

3  But even this strong interest must yield to the Defendant's right to require that the

4  Government prove each and every element of each charge against him.

5      Here, the present record is devoid of any indication that the specialized software

6  cannot be used to review files that are not designated as "publicly available" files

7  because such review is impossible or is technologically infeasible.[15]   The record is

8  likewise silent as to whether the code of the specialized software by its terms limits

9  itself to review of "publicly available" files, or that any similar self-imposed restraint

10  is otherwise hard-coded into the software. The expert declaration filed with the

11  Defendant's Supplemental Filing shows a need for the information because it goes

12  directly to the reliability of the Government's evidence as to an element of the two

13  transportation charges.

14      In sum, the Court finds that Defendant has made a showing sufficient to

15  overcome the qualified law enforcement privilege.

16  **D.      Request is not Overly Broad**

17      The Government also argues that Defendant's discovery request is overly

18  broad. (Opp'n at 10.) Defendant seeks an installable copy of the software at issue, all

19  documents regarding the software, including the software's technical specifications,

20  and all documents regarding any other software used by the Government in its

21  investigation.[16]   (*See* Motion Ex. A.) This request is admittedly broad. However, in

22  the absence of any information regarding the specialized software, and in light of the

23  fact that it appears that all of the information regarding the operation of the specialized

24

25  [15] Stated otherwise, and borrowing a particularly apt phrase from the Government, the record is
   devoid of the suggestion that it is not possible for "the law enforcement software [to override]
26  defendant's file-sharing settings." (Gov't Post-Hr'g Opp'n at 9.)
   [16] The Court does not understand the discovery request as seeking production of the software's
27  source code; rather, the defense seeks an installable version of the software used by Detective
   Syvock in order to subject the software to testing under controlled conditions. (10/27/15 Vol. I Tr. at
28  44 (defense expert testimony regarding testing).) The Court does not today order production of the
   source code.

1  software is in the custody of the Government or investigatory agencies, the breadth of
2  the discovery request is understandable. Moreover, although the parties directed the
3  Government and the defense to meet and confer regarding a software demonstration
4  that addressed the Defendant's specific concern, no such demonstration occurred.
5  According to the email attached as an Exhibit to the Defendant's Post-Hearing Brief,
6  after Defendant (again) articulated his specific concern regarding the software, the
7  Government did not respond regarding whether an appropriately tailored
8  demonstration of the software could be arranged. (Def.'s Post-Hr'g Brief Ex. B.)

9        Thus, although the discovery request is broad, it is directly relevant and
10  necessary to the defense. The Court therefore finds that the request is not overly broad
11  under the circumstances. Therefore, the Court GRANTS Defendant's Motion to
12  Compel and ORDERS production of the materials described below.

13        **E.    Order to Produce Software and Related Documents**

14        The Court orders the Government to produce an installable copy of both Peer
15  Spectre and Shareaza LE used by Detective Syvock during his investigation, as well
16  as an installable copy of any other software used by Detective Syvock during his
17  investigation to identify, access, or download any files belonging to Defendant or
18  associated with the two IP addresses identified by Detective Syvock as being at issue
19  in this prosecution.

20        The installable copies shall be the same versions used by Detective Syvock, and
21  shall be produced to Defendant in a manner that permits Defendant's expert to
22  conduct the testing she described at the evidentiary hearing. (10/27/15 Vol. I Tr. at
23  44.)[17]

24        Additionally, as to each type of software, the Government is ordered to produce
25  any of the following documents in its possession, custody, or control, (or in the
26  possession, custody, or control of the law enforcement agencies involved in the

27  _____
28  [17] The October 27, 2015 Volume I Transcript is attached to the Government's Post-Hearing brief as
an Exhibit. (Doc. 69-1.)

investigation of Defendant):  any documents containing or referencing software technical specifications, software development and updates (including updates, upgrades, and bug fixes), and software use (including user manuals, documents regarding hardware requirements, and documents related to troubleshooting).

Production shall be made pursuant to an appropriate protective order. The parties are to meet and confer regarding an acceptable protective order. Within **fourteen days** of the entry of this Order, the parties shall file a stipulated protective order; if the parties are unable to reach a stipulation, they are directed to file a joint report setting forth their respective proposals.

## IV.   DEFENDANT'S MOTION IN LIMINE [NO. 1] TO EXCLUDE "OTHER ACTS" EVIDENCE

Defendant seeks exclusion of his journal entries regarding text messages between Defendant and an individual referred to as H.S., her testimony, any discussions during Defendant's videotaped interrogation regarding H.S., and other similar discussions regarding allegations of prior inappropriate contact with minors. (Mot. at 3-4.) In response, the Government represents that it will not offer this evidence in its case-in-chief, but may seek introduction of such evidence if Defendant "opens the door."

On this representation, the Court GRANTS the Motion in Limine. In the event that the Government believes that Defendant opens the door to the introduction of such evidence, it may raise the issue again with the Court at trial, but it must do so out of the presence of the jury.

## V.   DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY

Defendant moves to exclude the expert testimony of David L. McCain pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G),[18] Federal Rules of Evidence 104, 702, and 703, and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589

---

[18] Rule 16(a)(1)(G) relates to the Government's duties regarding the disclosure of expert witnesses. The defense purports to move pursuant to Rule 16(a)(1)(C); however, that provision is inapplicable to the present Motion. *See* Fed. Crim. R. P. 16 advisory committee's note to 2002 amendment.

1   (1993). Specifically, Defendant moves to exclude McCain's testimony regarding

2   "common terms used in child pornography file titles and their meaning." (Mot. at 1.)

3   Defendant argues that McCain is not qualified to testify regarding this issue, and that

4   the Government failed to make the required expert disclosure pursuant to Rule

5   16(a)(1)(G). (*Id.* at 2.) The Government contends that McCain is qualified, and

6   provides additional disclosures regarding McCain's qualifications. As set forth below,

7   the Court **DENIES** Defendant's Motion to Exclude McCain's testimony.

8          When requested to do so by the accused, the Government is required to make

9   expert disclosures pursuant to Rule 16(a)(1)(G). More specifically:

10              At the defendant's request, the government must give

11              to the defendant a written summary of any [expert]

12              testimony that the government intends to use . . . during its

13              case-in-chief at trial. . . . The summary provided under this

14              subparagraph must describe the witness's opinions, the

15              bases and reasons for those opinions, and the witness's

16              qualifications.

17   Fed. R. Crim. P. 16(a)(1)(G).

18          The admissibility of expert testimony is governed by Federal Rule of Evidence

19   702, which permits testimony from witnesses who are experts because of their

20   "knowledge, skill, experience, training, or education," if their testimony satisfies four

21   criteria:

22              (a) the expert's scientific, technical, or other specialized

23              knowledge will help the trier of fact to understand the

24              evidence or to determine a fact in issue; (b) the testimony is

25              based on sufficient facts or data; (c) the testimony is the

26              product of reliable principles and methods; and

27              (d) the expert has reliably applied the principles and

28              methods to the facts of the case.

1    Fed. R. Evid. 702 (paragraph structure altered).

2    Under Rule 702, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals,*

3    *Inc.*, the Court has been assigned a gatekeeping role with respect to expert opinions,

4    and the Court must attend to its "task of ensuring that an expert's testimony both rests

5    on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

6    A trial court's "gatekeeping" obligation to admit only expert testimony that is both

7    reliable and relevant is especially important "considering the aura of authority experts

8    often exude, which can lead juries to give more weight to their testimony." *Mukhtar v.*

9    *Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002). Rule 702(a) addresses an

10    expert's qualifications and the relevance of the opinions he or she offers, and Rule

11    702(b) relates to the foundation underlying the expert opinions. Defendant challenges

12    McCain's qualifications under Rule 702(a) and the foundation of his anticipated

13    testimony under Rule 702(b).

14    As to the Rule 702(a) issue of McCain's qualifications, he is a former law

15    enforcement officer who has for some time worked as a computer forensics expert.

16    (*See generally* Mot., Ex. B (McCain *curriculum vitae*).) McCain's *curriculum vitae*

17    describes over a decade of extensive experience in forensic analysis of computers for

18    law enforcement investigations. (*Id.*) However, there are only three items that suggest

19    any involvement in child pornography cases. The first two, one in 2003 and another in

20    2013, are awards from the prosecutorial agency here, the United States Attorney's

21    Office, for his work in two child pornography cases. (*Id.* at 2-3.) The third reference

22    mentions "child exploitation" among other entries in a description of one of the many

23    types of criminal and civil cases in which McCain has been involved. (*Id.* at 3.) Thus,

24    there is little set forth in McCain's *curriculum vitae* that suggests any specialized

25    knowledge relating to child pornography investigations generally, and nothing at all

26    regarding the more specific topic at issue here:  terms commonly used in file names

27    containing images of child pornography. This suggests McCain is not qualified to

28    testify on the challenged topic.

1    From the record, it appears that the Government first provided a description of

2  McCain's qualifications on issues arising in child pornography cases when it filed its

3  Opposition to the present Motion. From this description, the Court concludes that

4  McCain is qualified to testify on the relevant issue as a result of the specialized

5  knowledge he gained through his experience in law enforcement investigations in

6  which he has examined over 1,000 devices containing child pornography and

7  additional related materials. (Opp'n at 4.)

8    Relating to the Rule 702(b) foundation issue, nothing in the Government's

9  initial disclosure, and nothing in McCain's *curriculum vitae* sets forth a description of

10  the bases and reasons for McCain's anticipated testimony. (*See* Mot. Exs. A-B.)

11  Indeed, a comparison of the Government's descriptions of the anticipated testimony of

12  its three experts, which is set forth in its September 24, 2015, letter to defense counsel,

13  reveals that although the bases of the opinion testimony of the first two experts are

14  disclosed, there is no similar description of the basis of McCain's testimony. (*See*

15  Mot. Ex. A.) However, McCain's extensive experience in forensic analyses related to

16  child pornography investigations, as described by the Government in its Opposition,

17  provides a basis for McCain's anticipated testimony.

18    The Ninth Circuit has found similar expert testimony admissible as Rule 702(a)

19  "specialized knowledge." For instance, in *United States v. Hankey*, the Ninth Circuit

20  held that the district court did not abuse its discretion in admitting expert testimony

21  regarding street gang affiliations and rules from a law enforcement officer who had

22  extensive experience working in law enforcement activities involving gang members.

23  203 F.3d 1160, 1167-69 (9th Cir. 2000). Based on this experience, the expert could

24  testify that co-defendants were members in affiliated gangs, that a gang-enforced

25  "code of silence" prohibited a gang member from testifying against a member of an

26  affiliated gang, and that a violation of that code would result in the gang member

27  being beaten up or killed. *Id.* at 1171. This testimony was made possible by the

28  expert's extensive experience in a specialized law enforcement field. This experience

29

1  allowed the expert to acquire the specialized knowledge that could assist the jury in

2  understanding the evidence or in determining a fact in issue.

3      In much the same way, McCain's extensive experience in conducting

4  examinations of electronic devices containing child pornography has allowed him to

5  acquire the specialized knowledge that could assist the jury in the present case. Thus,

6  the Court concludes that Rule 702 does not require exclusion of McCain's anticipated

7  testimony, that McCain is qualified to testify on the topic of common terms used in

8  child pornography file titles and their meaning, and that his anticipated testimony on

9  this issue does not lack foundation.

10     However, Rule 16(a)(1)(G) also imposes a disclosure requirement on the

11  Government, and Defendant has argued that the Government failed to provide the

12  required notice regarding the opinions it intends to elicit at trial from McCain. In

13  making its disclosure on September 24, 2015, the Government stated only that: "We

14  anticipate that Mr. McCain will testify about peer to peer networks, including

15  Gnutella, the use of eMule and eDonkey file-sharing programs as well as common

16  terms used in child pornography file titles and their meaning." (Mot. Ex. A (09/24/15

17  Letter from Gov't to defense counsel).)

18     The Government fails to address its compliance with this requirement, which

19  the Court views as a tacit admission that the Government failed to disclose in a timely

20  manner. It appears to the Court that the Government simply used the Opposition to

21  Defendant's Motion to Exclude as its opportunity to make the required disclosure.

22  Thus, the Court considers whether the Government's failure to make a more timely

23  disclosure warrants exclusion of McCain's testimony.

24     Generally, in the absence of prejudice to the defendant, the Government's

25  failure to comply with Rule 16(a)(1)(G) does not require exclusion. *See, e.g., United*

26  *States v. Mendoza-Paz*, 286 F.3d 1104, 1111-12 (9th Cir. 2002). For instance, in

27  *Mendoza-Paz*, the Ninth Circuit held that exclusion of an expert's testimony was not

28  required even though the Government failed to disclose the expert's qualifications

1   until four days before trial and to provide the basis for the expert's testimony until the

2   first day of trial. *Id.* In the absence of identifiable prejudice to the accused, exclusion

3   was simply not required. *Id.* at 1112. In so concluding, the Ninth Circuit looked to the

4   purpose of the expert disclosure requirement, and because the accused was provided

5   "with a fair opportunity to test the merit of the expert's testimony through focused

6   cross-examination," Rule 16 did not require exclusion for failure to make a more

7   timely disclosure. Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

8   Thus, the Court considers whether Defendant will suffer prejudice as a result of the

9   Government's failure to make its disclosure regarding McCain earlier than the date of

10  the filing of its Opposition brief.

11          When the Government filed its Opposition brief (with the required Rule

12  16(a)(1)(G) disclosure) on October 15, 2015, this case was set for trial less than two

13  weeks later, on October 27, 2015. At a status conference held the day after the filing

14  of the Opposition brief, on October 16, 2015, the Court continued the trial date to

15  December 1, 2015 because of the need to conduct an evidentiary hearing on two

16  defense motions. Because the Court continued the trial, there is no prejudice to

17  Defendant as a result in the Government's delay in providing the Rule 16(a)(1)(G)

18  disclosure. Therefore, this delay does not require exclusion of McCain's testimony.

19          The Motion to Exclude Expert Testimony of David L. McCain is DENIED.

20  **VI.    CONCLUSION**

21          As set forth more fully herein the Court rules on the parties' pretrial Motions as

22  follows.

23          The Court GRANTS IN PART the Government's Motion *in Limine* to Admit

24  Child Pornography Images and Videos. (Doc. 18.)

25          The Court GRANTS IN PART Defendant's Motion to Suppress. (Doc. 26.)

26          The Court GRANTS Defendant's Motion to Compel Discovery. (Doc. 27.)

27          The Court GRANTS Defendant's Motion in Limine re "Other Acts" Evidence.

28  (Doc. 28.)

The Court DENIES Defendant's Motion to Exclude Expert Testimony (Doc. 51).

In light of the Court's granting of the Motion to Compel Discovery, the parties are directed to meet and confer regarding a stipulation to continue the trial date that permits production of the materials ordered to be produced and Defendant's testing of the software. The parties are ordered to file an appropriate stipulation within seven days of the entry of this Order.

**IT IS SO ORDERED.**

**DATED:** November 24, 2015

_____

The Hon. Josephine L. Staton
United States District Judge