IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15CR275 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN CLEMENTS, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by its counsel, David A. Sierleja, Acting

United States Attorney, and Michael A. Sullivan, Assistant United States Attorney, and

respectfully submits this memorandum setting forth the United States' position regarding the

sentencing for Defendant John Clements.  For the reasons set forth below and those to be

articulated at the sentencing hearing, the United States submits that a sentence within the

applicable Guidelines range is appropriate in this case.

## I.      FACTUAL BACKGROUND

To support its sentencing position, the United States offers the following summary of

Clements's conduct.  The United States also refers the Court to the description included in the

Presentence Investigation Report ("PSR").  (R. 41: PSR, PageID 376-77).

In February 2014, Donald Seamon, a Lake County deputy sheriff's detective with the Federal Bureau of Investigation Child Exploitation Task Force was conducting an investigation of an individual sharing child pornography on the Gnutella 2 peer-to-peer network.  Seamon described, in detail, his investigation in a search warrant affidavit  in this matter. (R. 17-1, Affidavit, PageID 71-72).  Seamon described how a peer-to-peer network works and how his law enforcement software interfaced with the network.  (*Id*., PageID 72).  Seamon described how he noticed a computer sharing child pornography from a specific IP address, subscribed to by Clements in Lake County, Ohio. *(Id*., PageID 74).  Seamon further noted that he established a direct connection with the computer in question and downloaded four complete files and three partial  files of child pornography on May 5, 2014. *(Id.*, PageID 72-73).

A search warrant was executed at the defendant's residence on June 3, 2014.  Three computers, several hard drives, and storage Devices were seized. All three computers were noted to contain peer-to-peer programs and encryption.  Additionally, while previewing the computers, investigators found key word searches and files that appeared to be connected to child pornography.  (R. 41: PSR, PageID 377).  The defendant was interviewed and admitted to using Shareaza on one of his computers for several months to download child pornography. He admitted to using search terms he observed on different files to find child pornography. He claimed that he did not use or store the files, but viewed them and deleted them. He knew that Shareaza was a file-sharing program, but claimed that he did not know he was sharing child pornography. (*Id*.)

A forensic examination of the computers seized from the defendant's residence revealed 43 video files and 665 images of suspected child pornography, including at least one image and

two videos depicting sadistic or masochistic conduct. One video showed a prepubescent female kneeling on a blanket, wearing only stockings and a choke collar, with her genitalia exposed, and performing oral sex on a dog. At least ten of the children were known child victims. (*Id*.) Another video depicted a nude prepubescent female, sitting on a brown colored chair, with her legs spread, engaged in vaginal sex with an adult male. The female has the words "Fuck Me" written in black colored ink on her lower chest and upper stomach, with an arrow written in black colored ink, below it, on her lower stomach and upper abdomen, pointing in a downward direction toward her groin area.  An image, found on Defendant's computer, depicted a prepubescent female, wearing only black colored nylon stockings, with her legs and hands bound with yellow rope, laying on her back with her legs spread, exposing her genitalia. (Exhibit A).

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Precedent for Guideline Sentence

The United States' request for a guideline sentence in this case is consistent with the law and research highlighting the danger posed by child pornography offenders.  Numerous courts have emphatically expressed the wretched consequences of child pornography.  In *United States v. Goff*, 501 F.3d 250, 258-59 (3rd Cir. 2007), the Third Circuit noted:

> Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography.  These small victims may rank as anyone else in [defendant]'s mind, but they do indeed exist outside his mind.  Their injuries and the taking of their innocence are far too real.  There is nothing casual or theoretical about the scars they will bear from being abused for [defendant]'s advantage.

The defendant in *United States v. MacEwan*, 445 F.3d 237, 249-50 (3rd Cir. 2006), tried to downplay his receipt of child pornography by claiming that he was not a violent offender or a trafficker of guns or drugs.  The Third Circuit was not persuaded, reasoning as follows:

Congress found that where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years. Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children. Furthermore, it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

*Id.* (citations omitted); *see also United States v. Duhon*, 440 F.3d 711, 718-20 (5th Cir. 2006);

*United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v.*

*Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

The district court in *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio

2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), imposed a guideline sentence on a child

pornography defendant.  In denying the defendant's challenge to the legitimacy of the child

pornography guideline, the same one which applies to Clements, the court reasoned:

There can be no keener revelation of a society's soul than the way in which it treats its children.  Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.

Child pornography is a vile, heinous crime.  Mention the term to your average American and he responds with immediate disgust and a sense of unease.  However, once it enters the legal system, child pornography undergoes sterilization.  The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense.  Victims all too often remain nameless.  The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

In *United States v. Norris*, 159 F.3d 926, 929-30 (5th Cir. 1998), *cert. denied*, 526 U.S.

1010 (1999), the defendant claimed that children depicted in child pornography are not

victimized by receipt.  Rather, the defendant claimed that the victimization occurred solely when

the child pornography was produced.  *Id.*  The Fifth Circuit thoroughly repudiated that argument as follows:

> Norris takes an unrealistically narrow view of the scope of harms experienced by the child victims of the child pornography industry.  Unfortunately, the victimization of the children involved does not end when the pornographer's camera is put away.  The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in these materials to suffer as a result of his actions in at least three ways.
>
> *First*, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials.  [T]he materials produced are a permanent record of the children's participation and *the harm to the child is exacerbated by their circulation*. . . .  The consumer who merely or passively receives or possesses child pornography directly contributes to this continuing victimization.
>
> *Second*, the mere existence of child pornography represents an invasion of the privacy of the child depicted.  Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent . . . The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.
>
> *Third*, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials.  As Congress put it in explicit factual findings:
>
> > [T]he existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.
>
> Plainly, Congress has described a chicken-and-egg scenario in which it would be impossible to determine whether child pornographers or consumers of child pornography were initially responsible for the creation of the child pornography industry.  The underlying point, however, is that there is no sense in distinguishing, as Norris has done, between the producers and consumers of child pornography.  Neither could exist without the other.  The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production of child pornography, which entails continuous direct abuse and victimization of child subjects.

*Norris*, 159 F.3d at 929-31 (emphasis in original) (citations omitted).

      B.      Sentencing Commission Report

In his Sentencing Memorandum, Clements mentions a report prepared by the U.S. Sentencing Commission.  (R. 43: Def.'s Sentencing Memo, PageID 426-27).  The Sentencing Commission promulgated numerous recommendations that are consistent with this Court's imposition of a Guidelines sentence for Clements.

On February 27, 2013, the Sentencing Commission released its Report to Congress: Federal Child Pornography Offenses (the "Report"), which examines federal sentencing policy in child pornography cases, focusing primarily on non-production offenses under U.S.S.G. § 2G2.2.[1]  The Report, at its outset and throughout, confirms the extreme and multifaceted damage caused by child pornography.  The first of the "Highlights of the Report" contained in the Executive Summary section of the Report is the following:

> All child pornography offenses, including the simple possession of child pornography, are extremely serious because they both result in perpetual harm to victims and validate and normalize the sexual exploitation of children.

> •     Child pornography offenses inherently involve the sexual abuse and exploitation of children. Typical child pornography possessed and distributed by federal child pornography offenders today depicts prepubescent children engaging in graphic sex acts, often with adult men. Approximately half of child pornography offenders in the United States possess one or more images (including still images and/or videos) depicting the sexual abuse of a child under six years old and approximately one quarter of offenders possess one or more images depicting the sexual abuse of a child two years old or younger.

> •     Child pornography victims are harmed initially during the production of images, and the perpetual nature of child pornography distribution on the

---

[1] The Report can be found online at:

http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/index.cfm.

Internet causes significant additional harm to victims.  Many victims live with persistent concern over who has seen images of their sexual abuse and suffer by knowing that their images are being used by offenders for sexual gratification and potentially for "grooming" new victims of child sexual abuse.

- Child pornography offenses are international crimes.  Images depicting the abuse of children are transmitted both domestically and internationally to offenders across the world, each of whom may continue to redistribute the same images.  Once an image is distributed via the Internet, it is impossible to eradicate all copies of it.  The harm to victims is thus lifelong.

- The ready availability of child pornography on the Internet, the existence of online child pornography "communities" that validate child sexual exploitation and a growing but largely non-commercial "market" for new images all contribute to the further production of child pornography and, in the process, to the sexual abuse of children.

- Although child pornography validates and normalizes the sexual abuse of children, social science research has not established that viewing child pornography "causes" the typical offender to progress to other sex offending against minors.  For some offenders, however, obtaining sexual gratification through the use of child pornography is a risk factor for other sex offending against minors, as child pornography may strengthen existing tendencies in ways that may create a "tipping-point effect" if other risk factors are also present.

*Report*, pp. vi-vii.

The Report's early emphasis on the terrible impact of child pornography brings into clearer focus what the courts have known for some time—that child pornography has a highly destructive and lasting impact on the most vulnerable segment of society.  Not only does it devastate children, but it undermines all of society by perversely validating to some troubled individuals the sexual exploitation of increasingly younger children.  This anomalous normalization of what was previously deplorable conduct only serves to perpetuate and expand this terrible epidemic.

The Sentencing Commission has outlined some broad recommendations for revisions to the child pornography guidelines to better reflect the Commission's findings and the present state

of the child pornography landscape. *Report,* p. 322.  The Commission proposed the following

three categories of offender behavior as "the primary factors" that should be considered in

imposing sentences in § 2G2.2 cases:

> 1)    the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained and protected his collection over time, including through the use of sophisticated technology);
>
> 2)    the degree of an offender's engagement with other offenders—in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and
>
> 3)    whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

*Report,* p. 320.

The Commission also noted that:

> [T]he presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

*Report,* p. 321.  Although these revisions are not binding, consideration of these factors suggests

that a Guidelines sentence remains appropriate for Clements.

## III.    SENTENCING GUIDELINES COMPUTATION

The United States believes that the following Guidelines calculation is appropriate in this

case:  Clements has a base level of 22 under U.S.S.g. § 2G2.2(a)(2).  (R. 41: PSR, PageID 378).

A two-level increase for images depicting prepubescent minors applies under U.S.S.G.

§ 2G2.2(b)(2).  (*Id.*)  A four-level increase for sadistic or masochistic conduct applies under

U.S.S.G. § 2G2.2(b)(4).  (*Id.*)  A two-level increase for use of a computer applies under U.S.S.G.
§ 2G2.2(b)(6).  A five-level increase for 600 or more images applies under U.S.S.G.
§ 2G2.2(b)(7)(D).  (*Id.*).

A.  U.S.S.G. § 2G2.2(b)(1): Base Offense Level

Clements urges the court to grant him a two-point reduction, pursuant to U.S.S.G. §
2G2.2(b)(1), claiming that his "conduct was limited to the receipt or solicitation of material
involving the sexual exploitation of a minor; and [he] did not intend to traffic in, or distribute,
such material."  (R. 43: Def.'s Sentencing Memo,PageID 403-04).  He is mistaken, and both the
facts and the law rebut his assertion.  Quite simply, Clements' conduct **was not** limited to receipt
or solicitation.  Between February 25, 2014 and May 5, 2015, Clements was sharing at least 395
files of child pornography. (R. 41: PSR, PageID 376).  On May 5, 2014, an undercover officer
downloaded, **from defendant's** computer, at 4 complete files and three partial files depicting
child pornography. (R. 17-1, Affidavit, PageID 72-73).  Clements did distribute child
pornography.  Clements admitted using Shareaza.  Clements admitted knowing that Shareaza
was a file-sharing program; but claimed that he did not know he was sharing.  He may claim that
he did not knowingly share, but even accepting his minimization as true, the fact remains that **he
did share**, whether knowingly or unknowingly – his conduct was not limited to receipt or
solicitation.  In *United States v. Shepard* 661 Fed.Appx 348 (6th Cir. 2916), the Sixth Circuit
affirmed the denial of the same reduction sought by Clements.  In *Shepard*, the defendant, like
Clements, denied that he knew he was sharing files, but in Shepard, there was no evidence that
any files had ever been downloaded from Shepard's computer.  Still, the Sixth Circuit held that
the use of peer-to-peer software to  connect to other users' computers and download child
pornography (as Clements has admitted doing here) is sufficient to constitute knowing use of

peer-to-peer software, and makes a defendant ineligible for the requested reduction. (*Id*. At 353).

"A mere downloader's conduct is limited to receipt or solicitation, while a user of file-sharing

software, who enables others to view and download his illicit images and/or videos, has not

limited his conduct in this way." (*Id*.); see also *United States v. Abbring* 788 F.3d 565 (6th Cir.

2015).

Additionally, Clements argues that since the files downloaded by the undercover officer,

from his computer on May 5, 2014, were no longer present on his computer on June 3, 2014,

when his computer was seized, somehow he is entitled to the deduction.  Such non-sensical

argument appears to be a veiled attack on the credibility of the search warrant affiant ("particular

files allegedly downloaded from Mr. Clements"). (R. 43: Def.'s Sentencing Memo,PageID 404).

In fact, the undercover officer did download the files from Clements' computer, and Clements'

experts had full access to the logs evidencing same.  To flippantly disparage a sworn law

enforcement officer is yet another example of Clements' effort to minimize his own conduct.

Here, the facts are stronger than those in *Shepard*, and Clements' request for a deduction should

be denied.

    B.    U.S.S.G. § 2G2.2(b)(6): Use of a computer

Clements argues that the two-point enhancement for use of a computer, pursuant to

U.S.S.G. § 2G2.2(b)(6) constitutes impermissible double-counting.  (R. 43: Def.'s Sentencing

Memo,PageID 404).  Clements unsuccessfully attempts to distinguish *United States v. Lewis*,

605 F.3d 395 (6th Cir. 2010).  Clements argues that in *Lewis,* the Sixth Circuit held that the

"defendant did not need to use a computer in order to violate *the criminal statute* in question.

Here, however the *Indictment* expressly provides that a computer … was used to facilitate the

crime." (*Id*.)  (emphasis added).  Here, just like in *Lewis*, the statute references computer use as

one means of violating the statute, but does not require computer use, and indeed, computer use is not an element.  Also, like *Lewis*, here, the facts show that the defendant did use a computer, which triggered the enhancement.  Unable to distinguish *Lewis*, Clements seeks support for his position from a 2nd Circuit case, yet he curiously fails to mention *United States v. Walters*, 775 F.3d 778 (6th Cir. 2015).  Clements liberally quotes from the dissent in *Walters* later in his sentencing memo. (R. 43: Def.'s Sentencing Memo,PageID 427-28).  He also references the concurring opinion in *Walters* (*Id.* at 428).  But here, as to the computer double-counting argument, where the **holding** of *Walters* forecloses his argument, he is silent.

> It is often said that once a photo is online, it exists forever. Peer-to-peer software like that Walters used ensures as much: two people on opposite sides of the globe can instantaneously search, send, receive, and save materials at the click of a mouse. The enhancement remains relevant— regardless of its frequency of application— because the harm it addresses is real. And as the district court explained during sentencing, the enhancement applies in Walters' case not because he used a computer, but because his use of a computer ensured that thousands of people had access to videos of children being sexually assaulted over the course of 2012.

*Walters*, 775 F.3d at 787.

The two-point enhancement for use of a computer is properly applied.

C.     Use of U.S.S.G. § 2G2.2 in General

Clements objects to the application of the sentencing enhancements in U.S.S.G. § 2G2.2, arguing that they do not meaningfully distinguish among offenders.  (R. 43: Def.'s Sentencing Memo., PageID 423-29).  Clements's argument is flawed for multiple reasons.  The Sentencing Commission explicitly stated that it considered the frequency of certain enhancements in setting the base offense level at 22:

> The Commission determined that a base offense level of level 22 is appropriate for trafficking offenses because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images),

11

the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations.

U.S.S.G. App. C, Amendment 664, pp. 58-59 (emphasis added).

As the Commission clearly stated, they set the base offense level at 22, contemplating that almost every case would have an enhancement for use of a computer, material involving children under 12, and multiple files.  These enhancements were mandated by Congress, so the Commission effectively built them into the base offense level by setting the base offense level lower than they normally would have for an offense carrying a mandatory minimum five-year sentence.

Moreover, each of the enhancements is rationally based and is a reflection of either the Commission's institutional expertise or a Congressional mandate.  The flaw in Defendant's argument is his conclusion that if statistics show that most offenders are subject to certain enhancements, then those enhancements should be absorbed into the base offense level.  The reality is that law enforcement rightly targets the most serious offenders and may choose not to prosecute lesser offenders.  As such, statistics showing how often certain enhancements apply is not a reflection of how the offense is usually committed, but rather is a reflection of the success of law enforcement in identifying and apprehending those who commit the offense in the most serious way.

Finally, to the extent Clements argues that this Court should reject the Guidelines on policy grounds, his argument also fails.   "The fact that a district court may disagree with a Guideline for policy reasons and may reject the Guidelines range because of that disagreement does not mean that the court must disagree with that Guideline or that it must reject the Guidelines range if it disagrees."  *United States v. Brooks*, 628 F.3d 791, 800 (6th Cir 2011); see also *United States v. Cunningham*, 669 F.3d 723, 733 (holding that a "district court is entitled to

rely on the § 2G2.2 enhancements unless it has a reasonable policy basis for not doing so").

Indeed, there are plenty of district courts that continue to impose within guidelines sentences on

sex offenders.  As a result, this Court can and should rely on the sentencing enhancements

contained in U.S.S.G. § 2G2.2.

IV.    **APPLICATION OF § 3553(A) FACTORS**

     A.    Nature and Circumstances of the Offense

     Clements used a P2P program to search out and download images of child pornography.

He also used encryption.  The content of Clements's collection also supports a sentence within

the applicable Guidelines range.  Clements possessed numerous movies and images depicting

prepubescent minors, subjected to horrific acts of sexual abuse.  "An offender's pornography and

erotica collection is the single best indicator of what he wants to do."  Kenneth V. Lanning,

Office of Juvenile Justice and Delinquency Prevention, *Child Molesters: A Behavioral

Analysis‒For Professionals Investigating the Sexual Exploitation of Children,* 107 (5th ed.

2010).   Thus, the content of Clements's collection counsels in favor of a Guideline sentence.

     B.    History and Characteristics of Defendant

     To the extent Clements argues that his lack of criminal record should serve as a

mitigating factor, the United States asks the Court to consider the following: the defendant had

no physical or mental issues growing up, he had a good upbringing, he had no substance abuse

issues, and he received a good education.  Yet despite all of the positives in his life, he *chose* the

path of child exploitation.  In this regard, Clements' crimes are even more unsettling and make

his actions more aggravating.  Clements knew better.  Yet he is an individual that used his

positive attributes not for the greater good of society, but rather, to fulfil a selfish desire to prey

on society's most vulnerable—children.  Indeed, the stack of letters attached to his sentencing

memo reveal that Clements has a tremendous amount of support.  They also reveal that Clements

kept his dark side from his family and friends.  The letters consistently echo that the crime to

which Clements plead, was very uncharacteristic of him.  They argue that this conviction is not

representative of the true John Clements.  His mother excuses his conduct by characterizing it as

one 'blink of an eye.' (R. 43: Def.'s Sentencing Memo., PageID 423-29).   Yet Clements eyes

were wide open as he consumed the images and videos of prepubescent minors being raped and

abused.  His friends and relatives may know one side of Clements, but the victims of these

offenses have suffered because of another side.

   C.    Need for the Sentence Imposed to Reflect Seriousness of Offense, Promote
          Respect for the Law, and Provide Just Punishment

   When weighing the § 3553 factors, courts look at the severity and/or number of images when

deciding the defendant's appropriate sentence.  First and foremost, the Fifth Circuit recognized

this fact when it stated in *United States v. Miller*, 665 F.3d 114, 123 (5th Cir. 2011):

> We also disagree that it is "illogical to differentiate between defendants who view
> or distribute images of prepubescent children being raped and sodomized, as one
> example under the Guidelines, and those defendants who view or distribute
> pornography that depicts minors who are not prepubescent engaged in sexual
> activity that is not violent or sadistic.  We reject the view that because there are
> many defendants who view images of children under the age of 12 being raped and
> sodomized, and because there are many defendants who obtain hundreds of
> pornographic images of children, the terms of imprisonment should be reduced for
> all who receive or transport child pornography, regardless of the content of those
> images and regardless of the number of images.  The Guidelines treat differing
> behavior differently, and in our view, that differentiation is not unreasonable.

*See also United States v. Aumais,* 656 F.3d 147, 157 (2d Cir. 2011) ("[G]iven the violent nature

of the images, the number of them, and other considerations, . . . [t]he sentence is substantively

reasonable."); *United States v. Cunningham,* 669 F.3d 723 (6th Cir. 2012) (affirming sentence

where district judge reviewed all of the images to judge the defendant's conduct, and considered,

as "the nature of those images, the age of the children, [and] the conduct depicted in the images"

14

along with the other § 3553 factors); *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) ("The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose."); *United States v. Munjak*, 669 F.3d 906 (8th Cir. Feb. 28, 2012) (upholding sentence when the district court characterized Munjak's child pornography collection as "the worst I've seen" because of the size, violent imagery, and depictions of prepubescent victims).  The content of Clements's collection suggests the need for a substantial sentence under this factor.

Clements suggests in his sentencing memorandum that a long sentence of incarceration is unnecessary because "he will be punished by a lifetime of collateral consequences associated with being a convicted sex offender."  (R. 43: Def.'s Sentencing Memo., PageID 419).  The Sixth Circuit, however, has rejected this argument in the context of knowing possession of child pornography.  *See United States v. Bistline (Bistline I)*, 665 F.3d 758 (6th Cir. 2012).  In *Bistline I*, the Sixth Circuit found a sentence without imprisonment substantively unreasonable because it failed to reflect the seriousness of the offense or provide for any general or specific deterrence. The court noted that, under 18 U.S.C. § 3553(a), the *sentence* imposed must account for these factors, and the requirement of SORNA registration arose not from the defendant's conviction, not his sentence.  *Id.* at 767-68.

D.    Victim Impact

Congress has plainly indicated that "[e]very instance of view images of child pornography represents a . . . repetition of their abuse."  18 U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub. L. No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623 (2006)).  "Child pornography is, without qualification, a serious crime."  *United States v. Robinson*, 669 F.3d 767, 776 (6th Cir. 2012).  The seriousness

of child pornography is well-documented by the Eleventh Circuit, "Congress repeatedly has stressed the terrible harm child pornography inflicts on its victims, dating back to its first enactment of child pornography laws in 1977.  Since that time, it has not only made detailed findings, but has expanded repeatedly criminal exposure for the possession of child pornography." *United States v. Pugh*, 515 F.3d 1179, 1197–98 (11th Cir. 2008).  "[E]very instance of viewing images of child pornography represents a . . . repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub.L. No. 109–248 § 501(1)(A) & (D), 120 Stat. 587, 623.  Because child pornography is an extremely serious offense which irrevocably harms victims, the defendant's sentence must appropriately punish him for his participation in its consumption and distribution.  Unfortunately, "the focus of nearly every argument regarding the child pornography Guidelines is on the harm to the *offender*, rather than the harm to the victim." *United States v. Cunningham*, 680 F.Supp. 2d. 844, 863 (N.D. Ohio 2010).  Yet "the harm to victims is permanent and ongoing."  Id.  As the Court noted in *Cunningham*, it is "important to impose an appropriate sentence to alert end users to the fact that receipt and distribution in and of itself is a heinous crime deserving of a severe punishment." (*Id*).

The images and videos collected by Clements renew the abuse of countless, nameless victims.  These young victims, many who may never be identified, will carry the scars of this abuse, quietly and internally, for the rest of their lives.  By continuing to download these horrific images and videos, Clements has perpetuated the life-long pain for these children.  *He is responsible* for the continuing abuse of these victims and also for new victims, as well, as the demand for new child pornographic material spurs on its suppliers worldwide.

Fortunately for Clements, he'll one day be released back into society to attempt a new beginning. Again, the children Clements victimized will continue to serve a life sentence of shame, embarrassment, humiliation, and re-victimization.

      E.    <u>Need for Sentence to Afford Adequate Deterrence</u>

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *Irey*, 612 F.3d at 1206 (citing *United States v. Ferber*, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); *Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); *United States v. Goff*, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) (Transporting and receiving child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.  The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.).  In *United States v. Goldberg,* 491 F.3d 668, 672 (7th Cir. 2007), the court opined that:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded, consumed himself and disseminated to others.  The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the Sixth Circuit has reversed a district court that failed to see any importance in general deterrence.  *See United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012).  The district court stated, general deterrence . . . will have little [if] anything to do with this particular case. *Id.*  The Sixth Circuit found the district court's statement inexplicable and in any event conflicts with our statement that general deterrence is crucial in the child pornography context[.]  *Id.* (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

Despite the fact that Clements and others who have an overwhelming desire for young children may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if Clements received a low sentence.  These offenders do talk to each other via the Internet and they are concerned about law enforcement even encrypting their hard drives to prevent detection.  There is much to be gained by a significant sentence—increased safety for our children.

F.    Need to protect the public

In his Sentencing Memorandum, Clements further contends that he poses a low risk of recidivism.  (R. 43: Def.'s Sentencing Memo., PageID 419-21).  He cites to a Fifth Circuit case, *United States v. Polito*, 215 Fed.Appx. 354 (5th Cir. 2007), wherein a district court varied down, in part, because it found that the defendant "*was only eighteen years old and very immature at the time of the offense and his age and mental condition prohibited him from acting rationally*" (R. 43: Def.'s Sentencing Memo., PageID 420) quoting *Polito*, at 356-57 (emphasis added by Clements).  Laughably, Clements asks this court to compare his plight to that of an immature 18 year-old, when in the same sentencing memorandum, he highlights the fact that he was the valedictorian of his high school class, received a Bachelor's Degree in Chemical Engineering, worked as a Process Engineer for eight years, has had very supportive parents, been taught the

importance of taking responsibility for his actions, has been active in the church and a youth group and has been active volunteering (R. 43: Def.'s Sentencing Memo., PageID 419-21).

It is well established that child pornography offenses and sex offenses against children in general are systematically under reported and, because they are typically committed in the privacy of an offender's home without any witnesses, are particularly difficult to detect.  This vast under reporting of sexual offenses involving children, including child pornography offenses, has been called the base rate problem.  The base rate is the relative frequency which a state or condition occurs in a given population. Thus, when endeavoring to study sex offenders or more specifically child sex offenders, one must first determine the relative frequency with which they sexually offend. The problem with studying sex offenders is that it is extremely difficult, if not impossible, to determine reliably the number of offenses they have committed due to the vast under reporting of these types of offenses and the difficulty in detecting them when most occur in private behind closed doors.  Thus, the base rate is extremely difficult, if not impossible to accurately determine.  This in turn significantly hampers the reliability of any study of sex offenders in general and child sex offenders more specifically.

One study found that victim-survey research indicates that "as few as 5% and considerably less than 41% of adolescent and adult sexual assault victims report their victimization to the police, while fewer than 30% of child sexual assaults are reported to the police."  Susan Sachsenmaier, *The Basis for Extrapolation in Sexual Offender Risk for Recidivism Assessment*, 6 (July 21, 2010).  Moreover, studies which compared the number of victims officially known to authorities to the number of victims revealed by offenders' self-report (coupled with polygraphing and/or promises of confidentiality/immunity) showed that "only 2 to 15% of sexual assault victims are known to officials and only 1.5 to 53% of sexual

offenses result in an official record, with the average being much closer to the lower number."
*Id*. at 10; *See* Babchishin, Hanson and Hermann, *The Characteristics of Online Sex Offenders: A Meta-Analysis*, Sexual Abuse: A Journal of Research and Treatment, 110 (July 26, 2010).

Michael Bourke and Andres Hernandez conducted a study that compared two groups of child pornography offenders participating in a voluntary prison treatment program: men whose known sexual offense history at the time of sentencing involved the possession, receipt or distribution of child abuse images, but did not include any contact sexual abuse; and men convicted of similar offenses who had documented histories of contact sexual offending against at least one child victim.  Bourke and Hernandez, *The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*, Journal of Family Violence, Volume 24, Issue 3 (April 2009).  The study involved 155 sex offenders that had enrolled in an intensive, residential sex offender treatment program, 115 of who had no documented history of known contact sex offenses when sentenced. *Cunningham*, 680 F. Supp. 2d at 859.  The other 40 offenders had revealed 75 victims when sentenced.  By the conclusion of the therapy, only 24 offenders still denied committing a contact sex offense.  Stated differently, 91 of 115 that had previously denied such conduct admitted to contact offending during treatment.  *Id*.  The average number of victims revealed by those who had previously denied contact offenses was 8.7.  Those that previously admitted contact victims disclosed an average of 19.4 victims.  The study went on to note that of the 24 offenders that continued to deny any hands-on offenses, nine were polygraphed on the issue.  Only two of those nine passed.  *Id*.  "The dramatic increase (2,369%) in the number of contact sexual offenses acknowledged by the treatment participants challenges the often-repeated assertion that child pornography offenders are 'only' involved with 'pictures'".  *Id*.

Moreover, the recent evolution of the technology that facilitates child pornography crimes further undermines the predictive power of past studies focused on a cohort of offenders who lacked access to current technological tools which make it far easier to amass child pornography and hide activity from law enforcement.  For example, an offender, once caught through an online investigation, would be more likely subsequently to utilize techniques like open wireless, public hot spots, proxies, anonymous networks, and encryption, many of which have been widely adopted only during the last few years, and all of which make detection by law enforcement considerably more difficult.

Congress also has repeatedly recognized that recidivism rates are particularly high for sex offenders. Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling Congressional statements regarding the high risk of recidivism among child sex offenders).  Courts have recognized this as well.  *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008) ("child sex offenders have appalling rates of recidivism and their crimes are under-reported"); *United States v. Allison*, 447 F.3d 402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders).

## V.  **<u>CONCLUSION</u>**

For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a term of imprisonment within the applicable Guidelines range.

Respectfully submitted,

DAVID A. SIERLEJA
Acting United States Attorney

By:   /s/ Michael A. Sullivan
Michael A. Sullivan (NY: 2249993)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3977
(216) 522-2403 (facsimile)
michael.a.sullivan@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of May 2017 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Michael A. Sullivan
Michael A. Sullivan
Assistant U.S. Attorney